**SO ORDERED.**

**SIGNED December 01, 2010.**

_(signature)_

**STEPHEN V. CALLAWAY**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 09-11674 |
| HAROLD L. ROSBOTTOM, JR.<br>DEBTOR | CHAPTER 11 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING ISSUANCE OF ORDER APPROVING AUCTION SALE OF MINERAL ASSETS FREE AND CLEAR OF LIENS, ENCUMBRANCES AND INTERESTS AND FOR OTHER RELIEF AND FOR OTHER RELIEF**

Considering the **MOTION FOR ORDER AUTHORIZING AND APPROVING AUCTION SALE OF MINERAL ASSETS FREE AND CLEAR OF LIENS, ENCUMBRANCES AND INTERESTS AND FOR OTHER RELIEF** (the "_Sale Motion_") (Doc. #1251), the Court issues these **FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING ISSUANCE OF ORDER APPROVING AUCTION SALE OF MINERAL ASSETS FREE AND CLEAR OF LIENS, ENCUMBRANCES AND INTERESTS AND**

**FOR OTHER RELIEF AND FOR OTHER RELIEF** ("*Findings and Conclusions*"), as follows;

1.

This Court has jurisdiction and authority to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (N). Venue of this case in this district is proper under 28 U.S.C. § 1409. The statutory predicate for the relief sought herein is Section 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 6004.

2.

Written notice of the Sale Motion and of the Court's hearing thereupon (along with the proposed forms of the Sale Order (as defined within the Sale Motion)[1] have been shown to have been provided to all parties on the mailing matrix of this case. Said notice was adequate and timely, and given in conformity with this court's order setting hearing, and this Court therefore finds the same to be good and sufficient in the circumstances now confronting the Trustee and this Estate to bind all holders of Liens and/or Claims, as well as all known or unknown creditors, claimants, and other parties in interest to these bankruptcy proceedings. Cause exists sufficient to justify the Court's determination to hold its hearing on the notice and timing now utilized notwithstanding any otherwise conflicting requirement of Rule 2002(a)(2) FRBP, which notice period(s) have been waived properly and in accordance with Rule 9006, FRBP.

3.

The Trustee has determined that the Mineral Assets of the Mineral Holders should be sold through auction sale to be conducted by Clearinghouse as described within the Sale Motion. The primary sale will be conducted on **December 15, 2010**, or such other date as determined by the Trustee and Clearinghouse in the event of circumstances beyond their control that render

---

[1] Unless otherwise defined herein, capitalized terms shall have the same definition as in the Sale Motion.

December 15 a problematic Sale date.  This first Sale shall be of those properties described and listed upon exhibit A to the Sale Motion, which properties represent approximately 80% of the Mineral Asset value.  There will be a second sale currently targeted for February 17, 2011, which will involve for the most part undeveloped prospects and a small amount of producing property.  This second sale is made necessary because the status of due diligence precludes inclusion of these Mineral Assets into the December 15 Sale.

4.

The Court approves the Sale Motion as being in the best interests of the creditors and the estate, hereby adopting the assertions by the Trustee made within the Sale Motion as to the propriety of effectuating the Sale as proposed, including the Sale of the Mineral Assets of the non-Estate Mineral Holders, as follows:

a.  Sale of the Mineral Assets held by the non-Estate Mineral Holders should occur along with the sale of the Estate's Mineral Assets.  First, it appears as though the Estate holds the bulk of the Mineral Assets value-wise.  Second, RPC, Nitro Energy, KEH and CHEK rely upon Estate owned affiliate companies for administrative oversight, financial and accounting work, employees, and to some extent funding.  RPC and Nitro Energy are wholly owned by the Estate and given that neither has indebtedness of material value the Estate should obtain the full value from the sales of their Mineral Assets.  CHEK and KEH have by far the smallest concentration of Mineral Assets, and to carve their Mineral Assets out of the sale could have adverse effect upon the ability of any mineral manager to create or maintain value there (also, CHEK does have debt, with no current sustainable source of income with which to pay it; KEH has little debt except for mortgage debt associated with a residence in Florida, but the owners of KEH, along with the Trustee-the Estate holds a judgment against KEH-could utilize sale proceeds for distributions under prior order of this Court and payments upon the judgment

-3-

owed to the Estate). Clearinghouse will utilize its discretion and experience to determine whether it will be preferable to aggregate the Mineral Assets of some or all of the Mineral Holders into certain specific lots, and if the Mineral Assets of more than one Mineral Holder should be allocated into single lot(s), the Trustee will allocate the purchase price for such lots among the properties therein, with assistance of Clearinghouse. The determination of the Trustee to aggregate all of the Mineral Assets of the Mineral Holders for Sale through the auction is as proper use of business judgment and is a well founded proposal.

b.  the Trustee has marketed and in fact has sold, leased, subleased and assigned various Mineral Assets of the Estate and also has caused the sale, sublease, assignment of various Mineral Assets of the other Mineral Holders and has become familiar with the market during the prior nine (9) months.

c.  The widespread nature of the Mineral Assets would require a redoubled effort to upgrade the employee staff of the Mineral Holders to administer the Mineral Assets, and also continued administration of the Mineral Assets would require additional capital investment by the Estate and the other Mineral Holders to avoid depletion that is natural to producing assets.

d.  Without additional capital investment and staff increases, the Estate and the Mineral Holders could possibly become subject to attempts under various operating agreements to replace certain of the Mineral Holders as operators under applicable operating agreements, which could have an adverse effect upon the value of the interests held.

e.  Sale of the whole of the Mineral Assets allows for an economy of scale approach to disposition.

f.  The Trustee is working toward proposing a plan by the end of the second quarter of 2011 (and has so advised the Court in open Court presentation on the record), and sale of the Mineral Assets in 2010, in light of the hoped for tax consequences mentioned above, will (the Trustee believes) create an additional fund of several millions of dollars that might be used in connection with the confirmation process.

-4-

g.  The Sale will end the costs associated with the Mineral Assets (the accounting costs, for example, are approximately $12,000 per month across the board; as well there is administrative cost, employee cost, etc.).

h.  The Trustee has consulted with Clearinghouse, which conducts upwards of 90% of the auction sales within the oil and gas arena, as to whether an aggregate sale would be superior to asset by asset negotiated sales (which Clearinghouse also does), and both agree that the breadth of the smallish interests held by the Mineral Holders makes asset by asset negotiated sales impractical.

i.  The Sale as proposed is of a format that is familiar to and frequent within the industry, and will be conducted by an experienced mineral auctioneer in a customary setting; the Trustee believes that the Sale should not experience a bottom feeder group due to bankruptcy affiliation.

j.  While the Mineral Assets are being properly administered, the producing properties are by definition depleting assets, and without increased capital investment, additional development will be difficult.  Therefore, while the Court does not find that the Mineral Assets are depreciating in value (price adjustment could cause an increase, etc.), the difficulty with which additional development could be provided at least limits the estate's upside potential.

k.  The Mineral Assets are of material value to the Estate and it is difficult to attribute a percentage of overall estate value to the Mineral Assets.  The views the Trustee's suggestion that the value of the Mineral Assets as a percentage of the overall value of Estate assets, while substantial and material, does not represent a majority, but perhaps something in the range of 10-15% of overall Estate gross asset value.  Therefore, the Sale, while it is expected to generate a substantial sum of proceeds and cash fund, will not cause a depletion of the ability of the remaining Estate to pay debt of the Estate (and likewise will not cause a depletion of affiliated entity assets that will have any adverse effect upon the ability of the entities affiliated with the Estate to pay debts owed at that level).

-5-

l.　As shown upon Exhibit A to the Sale Motion, Clearinghouse and Tri Energy, in concert with the Trustee and counsel have allocated the Mineral Assets into two (2) basic categories.　Within Exhibit A properties are: (i) **ABS** (Absolute Sale) properties—properties currently estimated to be of a value less than $100,000; and (ii) **MB** (minimum bid) properties—properties (shaded in green) subject to a minimum bid requirement, currently estimated to be of value in excess of $250,000.　The MB properties will also be separately set forth on Exhibit 1 to Exhibit A, for ease of reference.　Clearinghouse has advised that the minimum bid level will not be disclosed within Exhibit A or prior to auction, that only the list of MB properties will be advertised. Clearinghouse, with assistance from the Trustee and Tri Energy, will continue to update and fine tune Exhibit A to the Sale Motion prior to date of the Sale, and it appears to the Court that Exhibit A, while it is very close to its final form could reflect, by the Sale, minor modifications, additions, and amendments.　Clearinghouse will perform engineering upon the MB lots and will provide its engineering and other findings to the Trustee within a week or two before the December 15 Sale, and minimum bids will be set in consultation with Clearinghouse.　It may be that after engineering and further analysis that certain MB properties will be allocated as NTB (notable) properties—properties determined to be of value between $100,000 and $250,000 if the values clearly fall below the $250,000 threshold for the MB properties designation as a result of pre Sale engineering and analysis.　The court has determined that this process is designed to obtain the highest values for the Mineral Assets at the Sale.

m.　With respect to the MB properties designated upon Exhibit A to the Sale Motion (shaded in green), and as may be so designated within the modified Exhibit A to be utilized for purposes of the February Sale, the Trustee has advised that Clearinghouse has in its experience received less than a minimum bid for a MB property and in such event routinely goes back to the seller (here the Trustee) to see if the seller wants Clearinghouse to go back to the bidder in an effort to negotiate the bidder closer to the minimum bid (projecting the

-6-

minimum bid is not an exact science). Through the Sale Motion the Trustee seeks authority to use his business judgment on a property by property basis to determine that a MB property should not be sold for less than minimum bid, or the price at which a MB Mineral Asset should be sold, in the event bid(s) received is/are less than the minimum bid assigned to that particular Mineral Asset lot. In the experience of Clearinghouse this happens infrequently, but it in the event it does, the Trustee suggests that he needs pre approval to deal with Clearinghouse so that Clearinghouse can deal with bidders. The Court finds that such pre approval is warranted, as to require the Trustee to halt the customary auction/post auction process regarding MB properties that may not have attracted minimum bids, would in fact subvert the customary sale processes utilized by Clearinghouse and create a stultified hybrid process requiring injection of the Court into a "starting over" so to speak.

n.  The Court concludes that the other particulars of the Sale process, such as qualifying bidders and bidder registration, document execution, indemnifications, cut-off date for ownership effectiveness (as of 7:00 a.m. on the date of the transfer), dealing with gas imbalances, settlement of funds distribution, reimbursement of promotional costs, payment of commissions, dealing with buyer default, etc., as contained within the Retention Agreement, and the exhibits thereto are reasonable and are directed at establishing a viable auction process and viable bidders.

o.  Upon final settlement of the sales making up the Sale, the Trustee will file the settlement statement(s)/recapitulation in the record of this case. This will provide the court and parties in interest with a record of the auction sales comprising the Sale.

5.

Although Section 363 of the Bankruptcy Code does not set a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, the Fifth Circuit Court of Appeals, in construing this provision, has required that it be based upon the

-7-

sound business judgment of the debtor. *In re Continental Airlines, Inc.*, 780 F. 2d 1223 (5th Cir. 1986), *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983).

6.

When a Trustee proposes to sell its business assets pursuant to Section 363(b) of the Bankruptcy Code, the bankruptcy court can consider several factors in determining whether to approve the sale, including: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether a transaction has been proposed and negotiated in good faith; (iv) the proportionate value of the asset to the estate as a whole; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; and (vi) whether the asset is increasing or decreasing in value. See *Continental Airlines*, 780 F.2d at 1226; See also, *Committee of Equity Security Holders v. Lionel Corp. (In re: Lionel Corp.)*, 722 F.2d 1063, 1071 (2nd Cir. 1983). The court concludes that the Sale should be approved as an exercise of the sound business judgment of the Trustee, upon the factual findings set forth in paragraph 4 of these Findings and Conclusions.

7.

The debtors spouse in community has consented to the sale made subject of the Sale Motion, has waived her right of first refusal under section 363(i), and has approved the form of the Sale Order.

8.

Gerald H. Schiff (the "***Trustee***") shall be and is hereby authorized to sell, through an auction sale to be conducted by Clearinghouse, the Mineral Assets of the Mineral Holders in accordance with the terms of the Retention Agreement between the Trustee and Clearinghouse, with such initial Sale to be conducted by Clearinghouse on December 15, 2010, or such other

date as determined by the Trustee and Clearinghouse in the event of circumstances beyond their control that render December 15 a problematic Sale date. There will be a second sale currently targeted for February 17, 2011, which will involve for the most part undeveloped prospects and a small amount of producing property. This second sale is made necessary because the status of due diligence precludes inclusion of these Mineral Assets into the December 15 Sale.

9.

The Sale of the Mineral Assets upon closing: (i) shall be a legal, valid and effective transfer of the Mineral Assets, and (ii) shall immediately vest Purchaser with all right, title, and interest of the bankruptcy estate of the Debtor in and to the Mineral Assets free and clear of all (a) mortgages, security interests, privileges, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership (the foregoing collectively referred to herein as "*Liens*") and all (b) debts arising in any way in connection with any acts of the Debtor, claims (as that term is defined in the Bankruptcy Code), obligations, demands, guaranties, options, rights, contractual commitments, executory contracts, unexpired leases, employment agreements, restrictions, rights of lesion beyond moiety, co-owner interests, community property or other spousal rights, tort claims, product liability claims, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity or otherwise (the foregoing collectively referred to as "*Claims*" herein).

10.

The Mineral Assets shall be transferred free and clear of all Liens and Claims of any kind or nature, except as otherwise expressly provided by the terms of this order ("***Sale Order***").  In the event there exist Liens or Claims that would and/or do encumber the Mineral Assets, such Liens and/or Claims will attach to the proceeds of the Sale.

11.

**Notwithstanding the terms of the preceding two (2) paragraphs, the Sale of the Estate's Mineral Assets _SHALL NOT_ be free and clear of** (i) the rights of royalty holders or overriding royalty holders, (ii) authority and rights of regulatory entities, (iii) plugging and abandonment obligations, (iv) operating agreements, (v) licensing requirements of applicable state, parish, county or municipalities, (vi) accrued taxes, or (vii) any other right or obligation that cannot be extinguished under applicable law by means of the Sale or the Sale Order (collectively the "***Retained Interests***").  Purchasers shall buy the Mineral Assets subject to any and all Retained Interests, and the Sale shall be without warranty by the Mineral Holders.  In the event there are Liens or Claims affecting the Estate's Mineral Assets, such will attach to the proceeds of the Sale.  **With respect to the non-Estate Mineral Holders, KEH, RPC, Nitro Energy and CHEK, the Sale will be subject to any encumbrances under applicable non-bankruptcy law.**

12.

All transactions and instruments contemplated under the terms of the Sale shall be specifically enforceable against and binding upon, and not subject to rejection or avoidance by the Estate, the Trustee, creditors of the Estate, and/or any other parties in interest, and any

-10-

successors of the Estate, including any subsequent trustee appointed in any subsequent or converted case of the Debtor under Chapter 7 of the Bankruptcy Code.

13.

By virtue of the Sale authorized hereby, the purchasers will not be a successor to the Debtor upon any theory of law or equity, and purchasers shall have no liability for any obligation, Claim or Lien of or against this Estate, the Debtor or any affiliate of the Debtor as a result of any application of theories of successor liability. The Sale of the Mineral Assets of the Estate does not and will not subject or expose purchasers to any liability, claim, cause of action or remedy by reason of such Sale under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia based directly or indirectly upon any theory of tort, creditors' rights, equity, antitrust, environmental rule or regulation, successor or transferee liability, labor law, *de facto* merger, or substantial continuity.

14.

The Court further finds (i) that the Sale Order shall be immediately effective and executory upon entry on the docket of the record of this case, and that the fourteen (14) day stay provided by FED. R. BANKR. PROC. 6004(h) shall be abrogated and waived by the Sale Order, so as to allow the Trustee and Clearinghouse to proceed immediately to conduct the Sale and to effectuate the closing and transfers contemplated by the Retention Agreement and by and within the Sale Motion and the Sale Order, (ii) that unless the Sale Order shall be stayed by means of an order issued by a Court with authority to stay the effectiveness of the Sale Order, the closing of the purchases of Mineral Assets via the Sale shall be concluded within the deadline established by the parties and the Retention Agreement, and (iii) that nothing in the Sale Order shall affect any of rights of any purchaser at the Sale or the Estate except as specifically set forth therein.

-11-

15.

The Trustee and Clearinghouse having acted from arm's length bargaining positions, and without fraud or collusion, and the consideration to be realized by the Estate having been found to be fair and reasonable, the purchasers at auction, assuming no collusion will have acted in "good faith" within the meaning of section 363(m) of the bankruptcy code, and shall be entitled to the protections afforded thereby.

16.

The Trustee should and will be authorized, pursuant to 11 U.S.C. §§ 363(b), 363(f), 363(m) and 362, (i) to execute and deliver, to perform under, and to consummate and implement the terms of the Sale, pursuant to the terms of the Sale Motion, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale, (ii) to take all further actions as may reasonably be requested by Clearinghouse and any purchaser at auction for the purpose of assigning, transferring, granting, conveying and conferring the Mineral Assets to any purchaser as may be necessary or appropriate to the performance of the obligations contemplated by the Sale, and (iii) to execute any and all documents on behalf of the estate or affiliated third parties, including without limitation the non-Estate Mineral Holders, to effectuate the terms and conditions of the Retention Agreement and Sale.

17.

The Court has expressly authorized the submission of these Findings and Conclusions by counsel for the Trustee, has independently reviewed these Findings and Conclusions and has determined that they should be issued to supplement any oral findings made by the court at hearing upon the Sale Motion.

09-11674 - #1275  File 12/01/10  Enter 12/01/10 13:43:08  Main Document  Pg 12 of 14

18.

The Court finds and concludes that it should retain jurisdiction to hear and determine all matters arising from or related to the Sale, and the documents executed and delivered in connection with the Sale and the Sale Order.

19.

The Sale shall be "AS IS," without any warranty of any kind or nature even as to title and/or return of all or any part of the purchase price.

#      #      #

**FINDINGS AND CONCLUSIONS PREPARED AND SUBMITTED BY:**

/s/ Louis M. Phillips
Louis M. Phillips, Bar No. 10505
Gordon, Arata, McCollam, Duplantis & Eagan LLP
One American Place
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801-1916
***ATTORNEY FOR GERALD H. SCHIFF, TRUSTEE***

**FINDINGS AND CONCLUSIONS APPROVED AS TO FORM AND SUBSTANCE BY**:

/s/ R. Joseph Naus
R. Joseph Naus   (#17074)
**WIENER, WEISS & MADISON**
A Professional Corporation
333 Texas Street, Ste. 2350
P. O. Box 21990
Shreveport, Louisiana  71120-1990
318-226-9100
318-424-5128, facsimile

AND

/s/ David S. Rubin
David S. Rubin   (#11525)
**KANTROW, SPAHT, WEAVER & BLITZER**

-13-

A Professional Law Corporation
445 North Boulevard, Suite 300 (70802)
P.O. Box 2997
Baton Rouge, LA  70821-2997
225-383-4703
225-343-0630, facsimile
***ATTORNEYS FOR LESLIE F. ROSBOTTOM***