

**SO ORDERED.**

**DONE and SIGNED February 22, 2012.**

STEPHEN V. CALLAWAY
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 09-11674 |
| HAROLD L. ROSBOTTOM, JR., | CHAPTER 11 |
| DEBTOR | JUDGE STEPHEN V. CALLAWAY |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING ISSUANCE OF ORDER APPROVING COMPROMISE OF PURPORTED DISPUTES AS TO OWNERSHIP OF PROCEEDS FROM SALE OF VESSEL AND VALIDITY OF LIENS THEREON AND REGARDING FUNDS RECEIVED BY NITRO GAMING RESULTING FROM "REVERSAL" OF PLANE TRANSACTION**

Considering the *AMENDED MOTION PURSUANT TO BANKRUPTCY RULE 9019 TO COMPROMISE PURPORTED DISPUTES AS TO OWNERSHIP OF PROCEEDS FROM SALE OF VESSEL AND VALIDITY OF LIENS THEREON AND REGARDING FUNDS RECEIVED BY NITRO GAMING RESULTING FROM "REVERSAL" OF PLANE TRANSACTION* (the "*Compromise Motion*") filed by Gerald H. Schiff, as chapter 11 trustee ("*Trustee*") of the Estate (the "*Estate*") of Harold L. Rosbottom, Jr. ("*Rosbottom*"), on

-1-

September 25, 2011 (Docket Entry #1445-1), the arguments of counsel, the testimony of witnesses and evidence presented at the hearing (the "***Hearing***") on the Compromise Motion held before this Court on October 3, 2011, and to supplement the Court's oral findings made after the Hearing, in open court, this Court issues these ***FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING ISSUANCE OF ORDER APPROVING COMPROMISE OF PURPORTED DISPUTES AS TO OWNERSHIP OF PROCEEDS FROM SALE OF VESSEL AND VALIDITY OF LIENS THEREON AND REGARDING FUNDS RECEIVED BY NITRO GAMING RESULTING FROM "REVERSAL" OF PLANE TRANSACTION*** ("***Findings and Conclusions***") as follows;

1.

This Court has jurisdiction and authority to hear and determine the Compromise Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) over which this Court has authority to conduct a hearing and to enter a final order. Venue of this proceeding in this district is proper under 28 U.S.C. § 1409. The statutory predicates for the relief sought herein are Sections 105, 363, 541, and 1108 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 9019.

2.

This bankruptcy case was commenced on June 9, 2009 (the "***Petition Date***") by the filing by the Debtor of a voluntary petition for relief under Chapter 11 of the bankruptcy code.

3.

Written notice of the Compromise Motion and of the Court's hearing thereupon has been shown to have been adequately and timely provided to all parties on the mailing matrix of this case in conformity with this Court's order setting hearing, and this Court therefore finds the same

to be good and sufficient in the circumstances now confronting the Trustee and this Estate to bind all holders of liens and/or claims, as well as all known or unknown creditors, claimants, and other parties in interest to these bankruptcy proceedings.

4.

For the reasons set forth below, Court approves the Compromise Motion as being fair and equitable and in the best interests of the creditors and the Estate standard for approving motions under Bankr. Rule 9019. These Findings and Conclusions are intended by the Court to supplement the oral findings and conclusions made after the close of the October 3, 2011 hearing and to constitute findings of fact and conclusions of law under and in accordance with Bankruptcy Rule 7052. Capitalized terms not defined herein shall have the same meaning as in the Compromise Motion.

5.

Under applicable Fifth Circuit law, the proposed settlement agreement should be approved as long as it is "fair and equitable and in the best interest of the estate." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (Matter of Foster Mtg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1996). In determining whether the proposed settlement agreement meets this standard, this Court should consider the following factors:

     i.    the probability of success in litigation, with due consideration for the uncertainty in fact and law;

     ii.    the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

     iii.    all other facts bearing on the wisdom of the compromise, including, among other things, the best interest of creditors with proper deference to their expressed

views, and whether the settlement was negotiated at arm's length. See *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (Matter of Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted).

## THE VESSEL, THE PLANE, AND THE "DISPUTES"

### 6.

On July 8, 2009, less than a month after the commencement of this bankruptcy case by Harold L. Rosbottom, Jr. ("***Rosbottom***"), an entity named CCH Charters, Ltd. ("***CCH***") bought a vessel, a 2004 65' Hatteras Sportfish, *Tru Resort*, with hull number HATGN727F304 (the "***Vessel***"). CCH was owned 100% by Ashley Kisla ("***Kisla***").

### 7.

Following his February 18, 2010 appointment in this case, the Trustee intervened as party plaintiff in Adversary Proceeding 10-1006 ("***Vessel Proceeding***"), which had been filed by Leslie Rosbottom and sought, among other things, recovery of the Vessel through avoidance of the transfer of Estate funds that Leslie Rosbottom alleged had been used to purchase the Vessel. In sworn testimony during continued creditor meetings, Rosbottom testified that Nitro Gaming, Inc. ("**Nitro**") had lent Kisla at least a portion of the Vessel purchase price but that no Estate funds had been used. Kisla, in deposition testimony, testified that Nitro provided the full cash portion for the Vessel purchase price through a loan it made to her. According to the testimony of Kisla, the Nitro loan to Kisla and/or CCH was evidenced by a promissory note secured by a security agreement and mortgage against the Vessel in favor of Nitro.

### 8.

The Trustee entered into a settlement with Kisla and CCH regarding the Vessel, giving the Trustee the authority to sell the Vessel for the benefit of the Estate, with Kisla and CCH

-4-

waiving any claims to the Vessel or proceeds from the sale of the Vessel. The Trustee filed a MOTION FOR ENTRY OF CONSENT PARTIAL FINAL JUDGMENT AND PERMANENT INJUNCTION ("***Vessel Judgment Motion***") in the Vessel Proceeding, which was granted by this Court through the entry of a PARTIAL FINAL JUDGMENT AND PERMANENT INJUNCTION whereby the Trustee was authorized to retain a broker to sell the Vessel for the benefit of the Estate, subject to a reservation of rights with respect to possible lien claims in favor of Nitro *purportedly* evidenced by note(s), acts of mortgage, and vessel lien recordation documentation produced by Kisla, copies of which had been attached to the Vessel Judgment Motion.[1]

9.

Ultimately, the Vessel was sold for the amount of $1,150,000, leaving net proceeds in the amount of approximately $1,000,000, after paying the sales commission of $100,000, the closing lawyer's fees and costs, dockage fees and a former captain's lien (the "***Vessel Proceeds***"). Following the sale, the Vessel Proceeds were held by the Trustee pending a determination of their ownership vis-à-vis Nitro, which is the subject of this Compromise Motion.

10.

On June 19, 2009, ten (10) days after commencement of this case, an entity named N73CL, LLC bought a plane, a Westwind 1124 aircraft with registration number N73CL (the "***Plane***"). N73CL, LLC was owned 50% by an entity named Westwind II, LLC, ("***Westwind***") which was owned by Kisla (the other co-owner was Levering Aviation, LLC, an entity owned by a Mr. Craig Levering ("***Levering***") and his spouse. Rosbottom, at continued section 341

---

[1] Because certain creditors held and hold claims against Nitro, the rights and alleged liens of Nitro were reserved for purposes of making certain that the rights of Nitro creditors would not be prejudiced by the Estate obtaining the proceeds of any sale of the Vessel.

-5-

meetings, and Kisla, in deposition, testified that Nitro was the source of the funds used by N73CL, LLC and/or Westwind to fund one-half of the purchase price of the Plane and that subsequently Levering Aviation, LLC had transferred funds (the "***Plane Proceeds***") back to Nitro either in repayment of a loan or to purchase the interest of Nitro in the Plane.

11.

The Trustee, through this Compromise Motion, seeks to compromise "purported" disputes over the ownership of the Vessel Proceeds and Plane Proceeds. As the Court finds below, the Trustee established at the Hearing that the disputes were not actual but a fiction created by Rosbottom and Kisla through false testimony, fraudulent book entries, and fabricated documents to cover up their use and concealment of Estate funds. The Trustee established that Estate funds were used to purchase the Vessel, that these funds existed on the Petition Date and were not disclosed by Rosbottom on his schedules (with one qualification – the initial deposit discussed below in the amount of $140,000 that was scheduled on February 18, 2010, the date on which this Court approved the appointment of the Trustee, and over 8 months after the Petition Date), and that fraudulent book entries were created in January and February of 2010 (less than a month before the Trustee was appointed) in an attempt to manufacture support for Rosbottom and Kisla's sworn testimony that Nitro was the source of the funds used to purchase the Vessel. The Trustee further established with respect to the purchase of the Plane, that Estate funds were used to purchase the one-half interest in the Plane, that false book entries were made in January 2010 regarding the use of Nitro funds, and that certain funds transferred to Nitro attributable to the Plane should have been paid to the Estate.

09-11674 - #1496  File 02/22/12  Enter 02/23/12 11:18:45  Main Document - Exhibits  Pg 6 of 38

12.

For these and for the reasons further detailed below, the Court finds that the Vessel Proceeds and the Plane Proceeds were/are Estate funds and not funds of Nitro or any other affiliated entity and that the compromise of the "purported" disputes proposed by the Trustee in the Compromise Motion is fair and equitable and in the best interests of the creditors and the Estate.

## THE SOURCES OF THE FUNDS USED TO PURCHASE THE VESSEL AND PLANE ARE TRACED

13.

The funds used to purchase the Vessel and the Plane were Estate funds and were not disclosed by Rosbottom (except as regards the very late disclosure of the $140,000 deposit put down upon the Vessel), despite several amendments to his bankruptcy schedules. Testimony of Kim Thayer, acting CFO of the affiliate entities owned by the Estate, along with documentary evidence adduced at the Hearing, established that for some months prior to the filing of the bankruptcy case Rosbottom and/or Kisla accumulated funds through cashier's checks made payable to him and hid the funds through false book entries or failing to book receipt of cash funds at all. The sources of the funds used in the Vessel and Plan purchases are traced and detailed in this section of these Findings and Conclusions.

14.

On August 1, 2008, a wire in the amount of $630,195 was received into Rosbottom's Chase account (#1577883471). On August 6, 2008, a check (#127520) was issued from this account in the amount of $530,195, payable to Rosbottom. On that same day, this check was converted into a cashier's check (#9171900259) in the same amount, **made payable to Rosbottom** ("*Cashier's Check #1*"). On August 6, 2008 the conversion of the funds into

Cashier's Check #1 was falsely booked as an investment in Gator Investments, LLC ("*Gator Investments*"), a company owned by Rosbottom—there was no such investment. As of August 6, 2008, Rosbottom possessed Cashier's Check #1--$530,195.

15.

On September 5, 2008, Rosbottom's Chase account (#1577883471) received $3,978,304 from Exploreco International, L.L.C. ("*Exploreco*"), a company owned in part by Gator Investments, as a distribution to Rosbottom from Gator Investments.

a.  On September 23, 2008, $2,000,000 of the $3,978,304 was transferred to Rosbottom's personal Plains Capital Bank account (#9140012315) and on September 26, 2008 these funds were used to make equal payments of $1,000,000 each against Plains Capital notes of Rosbottom (#1708866) and CHEK Investments, LLC, a limited liability company owned by the children of Rosbottom (#1825546);

b.  On September 25, 2008, $1,300,000 of these funds was withdrawn from Rosbottom's Chase account (#1577883471) in the form of a single cashier's check (#9460200517) made payable to Rosbottom ("*Cashier's Check #2*"). On September 25, 2008, Rosbottom was in possession of (i) Cashier's Check #1 ($530,195) and (ii) Cashier's Check #2 ($1,300,000), **or a total of $1,830,195**.

16.

On September 26, 2008, the $530,195 Cashier's Check #1 was cashed at Plains Capital Bank. Of this amount –

a.  $230,195 was converted into a cashier's check (#056047) payable to Rosbottom ("*Cashier's Check #1A*"); and

-8-

b. $300,000 was deposited into Rosbottom's personal Plains Capital account (#9140012315) and thereafter deposited into the Plains Capital account of CHEK (#3100023864) via a bank Counter Check.

As of September 26, 2008, Rosbottom was in possession of (i) Cashier's Check #1A ($230,195) and Cashier's Check #2 ($1,300,000), **or a total of $1,530,195**.

17.

*As of September 26, 2008*, the only book entires relating to any of the above receipts or transactions was the false book entry of Cashier's Check #1 as an Investment in Gator Investments.

18.

Beginning February 26, 2009, six months after the transactions referred to above, another series of transactions related to the purchase of the Vessel and Plane occurred, and a string of book entries were made (i) to record actual transaction history and (ii) to create additional false book entries relating to certain of the prior transactions described above.

19.

Though the Vessel purchase agreement was not executed by Rosbottom as buyer until May 18, 2009 (the Vessel purchase agreement contemplated cash consideration of $1,300,000 plus a trade-in of a 2006 35' Contender and called for an initial $140,000 deposit to be made to the yacht broker's escrow account), the deposit called for in the Vessel purchase agreement was made from the funds of Rosbottom on February 26, 2009 by payment of $140,000 by means of a check (#128111) written on the Rosbottom personal Chase bank account #1577883471, and made payable to Allied Marine.

20.

On February 27, 2009, an entry was booked recording the September 26, 2008 payment of the $1 million on the CHEK Investments note to Plains Capital Bank.

21.

On February 28, 2009 a false journal entry was created to record a fictitious transfer of $300,000 from the Rosbottom personal Chase account #1577883471 to the CHEK Plains Capital bank account # 3100023864.  The Court concludes that this booking was an attempt to hide $300,000 of Cashier's Check #2 by creating an entry that appeared to tie to the cash transferred on September 26, 2008 (of $300,000) to the CHEK Plains capital account from Cashier's Check #1.  In fact, the transfer of the $300,000 via the aforementioned Counter Check was sourced from the Rosbottom Plains Capital bank account #9140012315, not the Rosbottom Chase bank account #1577883471.  Because $300,000 of Cashier's Check #2 was falsely booked as a loan to CHEK, an entry was needed to connect to the cash that was transferred out of Cashier's check #1 (that had been falsely booked as an investment in Gator Investments).

22.

On March 6, 2009, the entry was booked recording the September 26, 2008 payment of the $1 million toward the Rosbottom note to Plains Capital Bank.

23.

Also on March 6, 2009, a false entry was made to record a wire of $1 million from the Rosbottom Chase bank account #1577883471 to pay the Rosbottom Plains Capital note #1708866. This note payment was never made.  In fact evidence was submitted showing that the note clerk had made penciled notes on the ledger sheets indicating that the note payment entry did not belong there.  Through the two bookings—on February 28 and March 6, 2009—of the

fictitious $300,000 transfer from Rosbottom to CHEK and the fictitious $1 million note payment from Rosbottom to Plains Capital Bank, the $1,300,000 Cashier's Check #2 was made to disappear, as from a records perspective it had been transferred to CHEK and to Plains Capital. It was not. Rather, as the Trustee established and as detailed below, it remained in the possession of Rosbottom until immediately before the Petition Date.

24.

Curiously, on March 24, 2009, the February 28, 2009 false entry describing the transfer of the $300,000 was reversed, but then rebooked the same way as a transfer from Rosbottom's Chase bank account #1577883471 to the CHEK Plains Capital Bank account #3100023864. Again, this transfer did not occur.

25.

Also on March 24, 2009, a cashier's check (#9038401105) for $290,000 ("**Cashier's Check #3**") was issued from Rosbottom's personal Chase bank account #1577883471, payable to Rosbottom. These funds were sourced from rebate checks paid to various convenience store affiliates. As established by the testimony of Tessa Rolland, an employee of the Rosbottom Enterprise, who kept a schedule of incoming rebate checks and who personally (i) took $290,000 in cash to Chase, and (ii) obtained Cashier's Check #3 and delivered it to Kisla (who waited outside in her vehicle), a number of rebate checks had been cashed into 2,860 - $100 bills, 194 - $20 bills, 2 - $10 bills, 7 - $5 bills and 29 - $2 bills, and placed in the "safe." These funds were transported to a local Chase bank branch (by Ms. Rolland at the direction of her supervisor) and were converted into the Cashier's Check #3 and delivered to Kisla while she sat in her car in the bank parking lot. Neither these rebate checks, the cash, nor Cashier's Check #3 was booked in the accounting records of Rosbottom or any affiliated entity. Thus, from a records perspective,

-11-

the $290,000 Cashier's Check #3 never existed (however, Ms. Rolland maintained a schedule of these rebate checks at the directive of her superior and did not destroy the schedules (as she was told to); the schedules were introduced into evidence at the Hearing). As discussed below, entries were made in the books in January and February 2010, immediately before appointment of the Trustee, in an attempt to hide the fact that Estate property had not been disclosed and had been used to purchase the Vessel. These book entries reveal an apparent attempt to create false documentation regarding the $290,000 as well.

26.

On March 30, 2009, the $140,000 check to Allied Marine cleared the Rosbottom personal Chase bank account (#1577883471) and stood as the deposit for the purchase of the Vessel. The $140,000 vessel deposit was unscheduled property of the Estate as of the Petition Date. It was not scheduled by Rosbottom until February 18, 2010, the day on which the Chapter 11 Trustee was appointed. The Court specifically notes that the Vessel purchase agreement was signed by Rosbottom on May 18, 2009. It was an executory contract that Rosbottom failed to schedule.

**THE FUNDS ARE CONVERTED INTO 17 CASHIER'S CHECKS**

27.

On June 4, 2009, a mere five (5) days prior to the Petition Date, a flurry of activity occurred -

a. The $235,190 Plains Capital cashier's check to Rosbottom dated September 26, 2008 (Cashier's Check #1A) was converted into two (2) cashier's checks in the amount of $115,097.50 each (## 073759 and 073757), made payable to Rosbottom. These funds, which were held by Rosbottom and therefore Estate property on the Petition Date, were not scheduled.

-12-

b. The $1.3 million Chase cashier's check to Rosbottom dated September 25, 2008 (Cashier's Check #2) which had been sourced from Rosbottom's personal Chase bank account (#1577883471) was exchanged for thirteen (13) $100,000 cashier's checks (## 9461501599 - 94615016011) - by means of a deposit of Cashier's Check #2 into an account of Rosbottom Interests, LLC (a company owned by Rosbottom) at Chase bank (# 754485712) and the immediate issuance of the thirteen (13) cashier's checks of $100,000 - each made payable to Rosbottom. These funds, which were held by Rosbottom and therefore Estate property on the Petition Date, were not scheduled.

c. The Chase $290,000 cashier's check to Rosbottom dated March 24, 2009 (Cashier's Check #3) was deposited into the Chase Rosbottom Interests account (# 754485712) and initially was converted into two (2) cashier's checks in the amount of $145,000 each (## 9461501612 and 9461501613) made payable to Nitro. These two $145,000 checks made payable to Nitro were immediately (on the same date) deposited (again) into the Rosbottom Interests account and converted into two cashier's checks of $145,000 each (## 9461501614 and 9461501615) - each made payable to Rosbottom. As above, these funds were held by Rosbottom on the Petition Date and therefore Estate property. These funds as well were not scheduled.

28.

As a result of the June 4, 2009 transactions converting the three cashier's checks (#1A, #2, and #3) - all of which had been payable to Rosbottom and all of which were Estate funds - Rosbottom held (i) 13 cashier's checks made payable to him in the amount of $100,000 each, (ii) two cashier's checks made payable to him in the amount of $115,097.50 each, and (iii) two cashier's checks made payable to him in the amount of $145,000, each. The total of these 17

-13-

checks was $1,820,195. Adding the $140,000 of Rosbottom funds transferred to the Vessel broker's escrow account, the aggregate amount of unscheduled Rosbottom funds held on the Petition Date was $1,960,195. This Court concludes that it would have been impossible for Rosbottom to have forgotten these cash transactions between June 4, 2009 and June 9, 2009, the Petition Date and that Rosbottom intentionally concealed and failed to schedule these funds.

29.

Based upon the evidence, the Court finds that the 17 cashier's checks in the aggregate amount of $1,820,195 were in Rosbottom's possession as of June 9, 2009, the Petition Date.

**THE PLANE PURCHASE CASH TRANSACTIONS**

30.

The following describes the myriad of transactions making up the transfer of Estate funds for the purpose of providing funding for the purchase of the Plane.

    a. On June 18, 2009, four (4) of the $100,000 cashier's checks numbered 9461501608 through 94615016011 (each made payable to Rosbottom and converted from the September 25, 2008 $1.3 million Cashier's Check #2) were deposited into two Chase bank accounts of a Rosbottom affiliate, Ohio River Amusement, LLC ("***Ohio River***"), accounts numbered #753720192 (operating) and #7537202200 (sweep).

    b. On June 18, one of the $145,000 cashier's checks (#9461501614, made from Cashier's Check #3) was deposited into the sweep account of Ohio River (account #7537202200).

-14-

31.

On June 19, 2009, the Estate funds deposited into the two Ohio River accounts (## 753720192 and 7537202200), totaling $545,000, were thereafter transferred by wire transfer to an account of another Rosbottom affiliate, Houma Inn, LLC ("**_Houma Inn_**") (account #790067698). On the same day, the funds (less $5,000) were then transferred by wire transfer (in two transactions in the amounts of $300K and $240K) from Houma Inn to North Texas Bank for the benefit of N73CL, LLC, the entity that purchased the Plane and of which Kisla's company, Westwind, owns 50%. These funds represented the payment of the Westwind share of the purchase price for the Plane.

32.

To recap, $545,000 of (unscheduled) Rosbottom funds sourced from Cashier's Checks #2 and #3 were deposited into two accounts of the affiliate Ohio River and the next day wired into another affiliate account,Houma Inn, and thereafter (on the same day) wired to N73CL, LLC to provide the funds used by Kisla's company, Westwind, to fund her share of the purchase price for the Plane. None of these transactions were booked until the end of January 2010, over 7 months later, and less than a month before the appointment of the Trustee.

### THE VESSEL PURCHASE CASH TRANSACTIONS

33.

The completion of the Vessel purchase was set in motion on July 6, 2009. The disposition of twelve of the seventeen cashier's checks obtained by Rosbottom on June 4, 2009 occurred as follows –

a. On or about July 6, 2009, the two (2) cashier's checks of $115,097.50 each (made payable to Rosbottom and converted from the September 26, 2008 $230,195 Plains

-15-

Capital Cashier's Check #1A) were transferred to Perry & Neblett, the law firm closing the purchase of the Vessel.

b. On July 6, 2009, one (1) of the two $145,000 cashier's checks (each made payable to Rosbottom and converted from the March 24, 2009 $290,000 Chase Cashier's Check #3) was transferred to the trust account of Perry & Neblett, the law firm closing the purchase of the Vessel.

c. On July 7, 2009, nine (9) of the thirteen cashier's checks of $100,000, numbered 9461501599-9461501607 (each made payable to Rosbottom and converted from the September 25, 2008 $1.3 million Chase Cashier's Check #2) were transferred and deposited into the trust account of the Perry and Neblett law firm, the lawyers closing the Vessel purchase.

34.

On July 8, 2009, funds held in the Perry & Neblett trust account were transferred out in payment for the Vessel, and there remained a balance in the trust account of $137,689. This remaining balance (plus an apparent $7,500 overpayment by Perry & Neblett) was transferred out of the firm's trust account to Nitro, on July 27, 2009 by wire of $145,189.[2] The receipt of the $145,189 by Nitro was never booked (recall that neither the rebate checks nor the $290,000 Cashier's Check #3 had ever been booked). This transfer constituted an undisclosed and unbooked transfer of Estate funds to Nitro.

---

[2]     On August 28, 2009 counsel from the Perry & Neblett firm requested that the $7,500 be returned by e-mail addressed to Rosbottom. The Trustee has not determined whether Nitro ever reimbursed Perry & Neblett for the $7,500.

09-11674 - #1496  File 02/22/12  Enter 02/23/12 11:18:45  Main Document - Exhibits  Pg 16 of 38

**STATUS OF BOOKINGS OF THE $1,820,195 IN ESTATE FUNDS AS OF JULY 27, 2009, THE DATE THE $145,189 IN ESTATE FUNDS WERE WIRED TO NITRO**

35.

As of July 27, 2009, the date as of which all transfers and transactions involving the purchase of the Plane and the Vessel were complete, the books of Rosbottom and his affiliate companies reflected the following entries to account for the existence of the $1,820,195—the cash making up Cashier's Checks 1A, 2 and 3:

      a.     The fictitious $1 million note payment to Plains Capital Bank;

      b.     The fictitious $300,000 loan to CHEK Investments, LLC; and

      c.     A fictitious $230,195 investment in Gator.

The $290,000 remained unbooked. The records of Rosbottom and his affiliates as of July 27, 2009, contained no reference to the Vessel or the Plane or to any of the transactions described above.

**THE PLANE IS BOUGHT; ESTATE FUNDS ARE TRANSFERRED TO NITRO**

36.

For reasons undetermined, Levering Aviation purchased the Westwind interest in the Plane by means of a $535,851.70 check dated October 28, 2009, made payable to Nitro. This check was subsequently replaced by a cashier's check, dated December 2, 2009, in the same amount made payable to Nitro.

-17-

## ROSBOTTOM AND KISLA TESTIFY

### 37.

On December 21, 2009, Rosbottom testified at one of several of the continued section 341(a) meetings of creditors. He was asked numerous questions about the Plane and Vessel transactions.[3]

### 38.

On December 22, 2009, the cashier's check sourced from Levering Aviation in the amount of $535,851.70 was deposited into the Nitro sweep account.

### 39.

On January 22, 2010, Kisla testified at a Rule 2004 examination. She testified extensively about the Vessel transaction.[4]

### 40.

Neither Rosbottom nor Kisla's testimony corresponds with the facts uncovered by the Trustee and the accounting staff for the enterprise of the Estate affiliates, and in fact is in conflict with the facts discovered concerning the true source of the funds used in the purchases of the Vessel and Plane.

## THE JANUARY AND FEBRUARY 2010 BOOKINGS OF JOURNAL ENTRIES IN AN ATTEMPT TO CREATE THE FICTITIOUS INTEREST OF NITRO GAMING IN THE FUNDS USED TO PURCHASE THE VESSEL AND PLANE

### 41.

On January 28, 2010, approximately seven months after the Plane transaction, and three (3) months after Levering Aviation purchased the Westwind interest in the Plane, entries related

---

[3]     See Appendix A

[4]     See Appendix B

09-11674 - #1496  File 02/22/12  Enter 02/23/12 11:18:45  Main Document - Exhibits  Pg 18 of 38

to the Estate's funds used to purchase the Westwind interest in the Plane were created on the books of Houma Inn and Nitro, in an attempt to cover the fact that Estate funds were used to fund the Westwind portion of the purchase price for the Plane.  Contrary to the actual June 18 and 19, 2009 transactions, which clearly involved the transfer of Estate funds through deposits and wire transfers to convert Estate funds into an investment into Kisla's company so it could turn the funds into an ownership interest in the Plane, these January 28, 2010 entries had the effect of recording a transfer of $540,000 cash from Houma Inn to Nitro to cancel a loan due from Houma to Nitro, and the use by Nitro of that cash to purchase rolling stock (autos and trucks).  On the same day, the payment to Nitro by Levering Aviation was booked as a transfer of cash into Nitro and a transfer by Nitro of autos and trucks.  Also, a miscellaneous expense was booked to record the difference between the $540,000 that went out of Houma and the $535,851.70 that came in to Nitro from Levering.  The transfers purportedly memorialized by the January 28, 2010 entries never occurred.

42.

Notwithstanding that the accounting system already reflected the fraudulent book entries for the funds that were paid toward the Vessel and Plane purchases, except the $290,000 in cash that had been turned into Cashier's Check #3,[5] an effort began on January 29, 2010 (some 20 days before the appointment of the Trustee) to create a fictitious set of entries designed to hide the Estate's interest in the funds used for the Plane and Vessel.  The series of bookings reflected (i) a $1.590 million loan from Nitro to Kisla and (ii) various credits against the loan on the basis of fictitious amounts due Kisla booked as loan payments.  Despite the efforts at concealment

---

[5]        Though the bookings done in February and March 2009 relating to the $230,195 Cashier's Check 1A and $1,300,000 cashier's Check #2 were false, they still were in place.

-19-

(and, presumably unbeknownst to those creating the fraudulent entries), the financial software used by the enterprise records the date that each entry in the books is made. It can be determined, then, that in its haste to create a set of false entries to hide the fact that Estate funds were used to purchase the Vessel, pre-Trustee management booked the entries backwards. Though the intention must have been to book a loan from Nitro to Kisla and then debts due Kisla that could act as payments of the fictitious loan, in fact the first book entries (January 29, 2010) were of the debts to Kisla and the credits to the (then nonexistent) loan to Kisla from Nitro. It was not until February 10, 2010 that the entry regarding the fictitious loan (that had already been paid down by the fictitious credits) was created.

43.

The Court finds that the January 29, 2010 series of accounting entries on the books of Ohio River and Nitro were designed to create fictitious amounts due Kisla and then to credit those amounts against a fictitious loan from Nitro from Kisla which had not even been created on the books of Nitro.

44.

In particular the book entries that began on January 29, 2010 were:

a.    a $200,000 commission due to Kisla from Ohio River;

b.    an entertainment expense of $82,000 due to Kisla from Nitro Gaming;

c.    $194,670 for the buy-back of shares in an affiliate—Gaming Solutions, LLC;

d.    $130,000 for commissions due to Kisla from Gaming Solutions; and

e.    $125,000 in commissions due to Kisla from Nitro Gaming.

These supposed offsets total $731,670.

-20-

45.

On February 10, 2010, a second series of accounting entries were made on the books of Rosbottom Interests and Nitro which had the effect of creating a fictitious loan from Nitro to Kisla in the amount of $1,590,000. The use of the intercompany accounts of Rosbottom Interests and Nitro was a sham to hide the the fact that the $1.3 million cashier's check that was deposited into a Rosbottom Interest Chase account was done so for the purpose of issuing the thirteen cashier's checks of $100,000 each to Rosbottom, and the $290,000 was deposited into the same Rosbottom Interests account for purposes of issuance of the two $145,000 cashier's checks to Rosbottom. There was no effect upon the books of Rosbottom Interests, as the bank account of Rosbottom Interests was used simply as a conduit for the cashier's check conversions and as a shill account for constructing the sham loan transaction. Through this series of entries, the books of Nitro came to reflect a loan to Kisla of $1,590,000, and that the source of the cash funds loaned ($1,590,000) was the Nitro safe. The Court finds that this did not happen, and it is clear that no Nitro funds were used toward the purchase of the Vessel.

46.

The only "backup" for the supposed Kisla credits came in the form of a napkin (produced by the Trustee at the Hearing and entered into evidence) found by the accounting staff in the back of a drawer in the St. Rose office of the previous controller. This napkin was attached to copies of the journal entries for the purported $1.59 million loan from Nitro to Kisla and the credits booked against the purported loan from purported amounts due Kisla from the various entities. It is clear from review of the napkin that attention was placed on backing into a number for a credit, to tie in to the Vessel purchase price and to establish the supposed credits against the supposed loan from Nitro. Further, the accounting staff discovered a February 4, 2010 e-mail

-21-

(sent after the January 29, 2010 bookings) from Kisla to Angela Maher, to which was attached a copy of a single handwritten note pad sheet (which Kisla advises in the e-mail to be Rosbottom's) with numbers and bookings to be made, as calculated upon the napkin. Finally, the Trustee introduced a second note pad sheet containing mark outs and modifications to get to the matching journal entry numbers.

47.

The Trustee also introduced copies of documents purportedly evidencing the loan from Nitro to Kisla and a security interest in favor of Nitro in the Vessel. However, according to testimony adduced at the Hearing, no originals of the purported (i) Note from CCH to Nitro, (ii) Kisla guaranty agreement, (iii) preferred ship mortgage, (iv) Vessel security agreement or (v) registry form, copies of which were previously produced by Kisla (collectively "***Purported Loan Documents***"), were found to exist. Nor were any electronic versions of the Purported Loan Documents found to be stored on the electronic storage drive of Nitro. No paper copies have ever been found by the Trustee, the CFO, or her accounting staff. Furthermore, the Court notes that there is only one signature on any of the Purported Loan Documents: that of Kisla. There is no witness on any document. There is no notary signature. The registry form for recording the purported mortgage was never recorded. The Court notes that it is at least customary for both sides to a Security Agreement to execute such an agreement, and that was not done here. In light of all this, the Court concludes that the Purported Loan Documents constitute a further step in the sham.

48.

Further evidence of the falsity of the January and February 2010 journal entries is the problematic fact that after these entries were made, the original accounting for the cash making

-22-

up Cashier's Checks 1A and 2 (totaling $1,530,195), which was comprised of the entries booked in August of 2008 and in February and March of 2009 (the false investment in Gator Investments, the $530,195 which made up Cashier's Check #1 which was thereafter reduced to Cashier's Check 1A-$230,195, the false booking of a $300,000 transfer from Rosbottom to CHEK, and the false booking of the transfer of the $1 million loan payment to Plains Capital), remained on the books. The actual cash of the Estate that was transferred out of the Estate to fund the Vessel and Plane purchases amounted to $1,960,195 (the $1.3 million, plus the $290,000, plus the $230,195, plus the $140,000). However, as of February 10, 2010, after those false bookings were made, the books reflected the existence of too much cash because the original bookings had not been reversed. The book entries made before the Petition Date already reflected $1,530,195. After the false bookings in 2010, an additional $2,130,000 in cash had been created through the false bookings of (i) the $1,590,000 loan to Kisla and (ii) the $540,000 purchase of the Plane by Nitro (the false loan to Kisla was fabricated to create the cash used to fund the purchase of the Vessel). Once the deposit was booked on February 18, 2010, another $140,000 was added to the book entries. The result of this universe of entries was to create generated booked cash transactions in the aggregate amount of $1,530,195 plus $2,130,000 plus $140,000, or $3,800,195. In fact, the cash used in the Plane and Vessel transactions totaled $1,960,195 (the $230,195 Cashier's check #1A, the $1.3 million Cashier's Check #2, the #290,000 Cashier's check #3 and the $140,000 deposit). So, the false 2010 bookings added some $1,840,000 in non-existent cash to the books of Nitro, Rosbottom and other affiliates.

49.

Diligent effort on the part of the Trustee, his appointed CFO for the enterprise, and her staff uncovered the funds path of the transactions detailed in these Findings and Conclusions,

and the funds path was documented through testimony and evidence introduced at the Hearing. In the course of these efforts, the Trustee discovered that looking-backward book entries by Rosbottom and his associated entities were not at all uncommon and further discovered that the Rosbottom accounting system reveals when such entries are actually made. By focusing on the dates on which the entries were made rather than the dates on which the entries were posted (as having been made), the Trustee was able to follow the activity of the pre-Trustee management in its attempt to hide the fact that Estate funds were used in the Vessel and Plane transactions.

50.

Most significantly, this analysis revealed that Rosbottom accounting entries regarding both the Plane and Vessel purchases were not made until late January 2010 and in February 2010 - some seven (7) months after the purchases, and immediately before the appointment of the Trustee. That the books and records contained none of the supposed bookings that would have supported the sworn testimony of Rosbottom and Kisla until AFTER THE TESTIMONY ABOUT THE TRANSACTIONS clearly indicates an intention on the part of Rosbottom and Kisla to keep hidden the fact that the funds used were Estate funds.

## SUMMARY AND CONCLUSION

51.

The Court finds and concludes (i) that the booked "loan" from Nitro to Kisla did not occur, (ii) that the alleged amounts due Kisla were created by the simple act of making false entries after a calculation performed upon a napkin and note pad sheets and were/are without basis, (iii) that the funds used to purchase the Vessel and the Westwind interest in the Plane were Estate funds, (iv) that the funds returned to Nitro by the Vessel closing lawyer and by Levering Aviation should have been returned to the Estate, (v) that the Estate funds used to purchase the

-24-

Vessel and the Westwind interest in the Plane were not disclosed on the schedules of Rosbottom and therefore were concealed from creditors of the Estate (with the one exception that the $140,000 deposit was scheduled on February 18, 2010, the date on which the Trustee was appointed), (vi) that the testimony of Kisla and Rosbottom concerning the Vessel and Plane purchase was false, (vi) that the Purported Loan Documents were, simply, a sham, and (vii) that the pre-bankruptcy and post-bankruptcy machinations were designed first, to hide cash and second, to hide the fact that Estate cash was used for the post-petition purchase of the Vessel and Plane for the benefit of Kisla.

52.

In summary, the Court finds that the Trustee has established that the funds used for the Vessel and Plane purchases were property of the Estate. Nitro received from the Vessel purchase closing lawyer some $145,000, of which, approximately $137,000 was property of the Estate (at least $7,500 was returned in error). Nitro received all but some $4,000 of the Plane purchase amount upon the purchase by Levering Aviation of the Kisla-owned Westwind share of the Plane. The Court finds no valid business justification for the making of the pre-bankruptcy or the post-bankruptcy book entries (or the timing of those entries) described above and no justification for failure to schedule the funds that were clearly Estate funds. The Court further finds no valid business reason or any justification whatsoever for the flurry of cashier's check transactions on June 4, 2009. These actions rendered the debtor in possession structure of the Bankruptcy Code a shambles. The purported structures as testified to by Rosbottom and Kisla and the Purported Loan Documents were shams; the book entries were completely made up. The scheme, simply, was one to funnel Estate funds out of the Estate for the benefit of Kisla or perhaps Rosbottom, through Kisla.

53.

The Court appreciates that the Trustee properly recognizes that, as representative of the Estate, he is the control person for Nitro,[6] and that one route he could have taken would have been to have Nitro retain counsel separate from that of the Trustee. However, practical considerations and the fact that the "dispute" being compromised was wholly fabricated made it proper for the Trustee to put forward the Compromise Motion, with the rights of parties with standing to object and assert to the Court the necessity of formal adversary process and separate counsel. Notice of the the Compromise Motion and the Hearing was given properly. No such objections were received by the Court or voiced by any parties appearing at the hearing on the Compromise Motion.

54.

The Court finds that the Trustee directed the affiliate enterprise CFO Kim Thayer, whose job responsibility it is to provide accurate accounting and analysis for the enterprise and through that process to provide accurate accounting to the Estate, to provide the Trustee with as accurate a recapitulation of what actually occurred regarding the Vessel transaction as possible, given the interests of certain creditors holding claims against Nitro. The Court finds that the Trustee carried out his duty to the Estate and as well his duty as president of Nitro.

55.

The Court finds that there is no basis whatsoever for even a suggestion that Nitro funds were used in the Vessel or Plane purchase, and that furthering the sham set of booked transactions would in effect constitute perpetuation of a fraud on the Court. The Court finds that (i) the post-bankruptcy book entries described herein were false, (ii) the pre-bankruptcy book

---

[6] Through corporate act he has become the sole director and president of Nitro.

-26-

entries regarding the funds that ultimately were used to purchase the Vessel and Plane were either false or non-existent, (iii) Estate funds were used to purchase the Vessel and the Westwind interest in the Plane and that pre-Trustee management controlled intentional actions designed to hide these facts, and (iv) the Purported Loan Documents advanced by Kisla and Rosbottom were fabricated and a sham. Upon these findings there can be no dispute regarding whether there is in fact a dispute. The purported dispute was made up out of whole cloth by false book entries and false testimony. The Court need not give any credence to the supposed dispute. Thus, the Court finds that the compromise proposed by the Trustee is fair and equitable and in the best interests of the creditors and the Estate. Further, while the Court recognizes that the settlement is between affiliated parties, with the Trustee being estate representative and also President of Nitro, this relationship does not cloud the clearly established facts set forth herein. To require the Trustee to go through the cost and expense of additional proceedings would in effect be tantamount to the Court embracing and supporting/giving credence to the Rosbottom/Kisla fictional dispute, false testimony, concealment of estate property and fraudulent transferring of the estate property as described herein. The Court will neither be a participant in nor perpetuate the frauds created by Rosbottom and Kisla.

56.

Accordingly, with respect to the approximate $535,000 Nitro received from the Plane transaction, and the $145,000 that was returned to Nitro by Vessel closing counsel, the Court adopts the Trustee's proposal that these monies be booked as post-petition receivables due the Estate, and that Nitro should remain a funding source for certain administrative claims and plan

-27-

payments with the entries booked as amounts due the Estate.  In other words, Nitro owes the Estate those amounts (this is not a determination that third parties do not owe the Estate).[7]

57.

In light of these Findings and Conclusions, the Court determines that the proceeds from the sale of the Vessel which are currently held by the Trustee are proceeds and property of the Estate.  The Court approves the proposed settlement with Nitro whereby the funds received by Nitro from both Levering Aviation and the firm of Perry & Neblett be booked as post-petition accounts payable and paid to the Estate or reorganized Estate in the discretion of the Trustee through means including (i) payments toward administrative expenses and/or (ii) funding the plan payments due creditors of the Estate as opposed to creditors of Nitro.  The Trustee is authorized to undertake and perform all such actions as may be necessary and consistent with this Court's approval of the Compromise Motion and its implementation.

58.

The Court has expressly authorized the submission of these Findings and Conclusions by counsel for the Trustee, has independently reviewed these Findings and Conclusions, and has determined that they should be issued to supplement any oral findings made by the Court at the hearing upon the Compromise Motion.  The Court will issue a separate irder approving the C.M. contemporaneously herewith.

---

[7]     The Estate retains its claims against Kisla and any other parties for losses sustained in the Vessel transaction and otherwise.

-28-

59.

The Court finds and concludes that it should retain jurisdiction to hear and determine all matters arising from or related to the consummation of the compromise approved herein, and any documents executed and delivered in connection therewith.

# # #

**FINDINGS AND CONCLUSIONS PREPARED AND SUBMITTED BY:**

<u>/s/ Louis M. Phillips</u>
Louis M. Phillips, Bar No. 10505
Gordon, Arata, McCollam, Duplantis & Eagan LLP
One American Place
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801-1916
***ATTORNEY FOR GERALD H. SCHIFF, TRUSTEE***

## APPENDIX A

### December 21, 2009 341(a) Excerpts
### Harold L. Rosbottom, Jr.

21    Q. Now, if you look at this statement with the
22    airplane, the Statement in Support of Registration
23    Bill, it lists two entities as the owner of N73CL,
24    LLC.
25    A. Yes.

1    Q. It lists Levering Aviation, LLC, and it
2    lists another entity, westwind II, LLC.
3    A. uh-huh. (Nods head affirmatively.)
4    Q. DO you know anything about westwind II, LLC?
5    A. No.
6    Q. You don't know who owns that?
7    A. NO. I can tell you, though, and I think
8    this is what you're getting to, that at the time of
9    the closing of the airplane, Mr. Levering was out of
10    the country and Nitro Gaming paid for part of the
11    airplane and since that time has been reimbursed by
12    Mr. Levering.
13    Q. And that was on June 18th, 2009, after you
14    filed bankruptcy?
15    A. You know, I don't recall the date.
16    Q. DO you have any interest or does Ms. Kisla
17    have any interest in westwind II, LLC?
18    A. I don't have any interest.
19    Q. Does Ms. Kisla?
20    A. I don't know.
21    Q. You don't know whether she has any interest
22    in that LLC?
23    A. Not specifically, no, sir.
24    Q. So Nitro Gaming, after you filed bankruptcy,
25    advanced funds to pay for that aircraft on behalf of

1    Mr. Levering's company. Is that what you said?
2    MR. STEFFES: That's not what he said,
3    Chip. He said he didn't know the date.
4    Q. (By Mr. Naus) well, the purchase date is
5    June 18, 2009. would it have been before that?
6    A. I don't recall the date.

Pages 60-62

16    Q. Do you have any idea how much you advanced
17    on behalf of Nitro Gaming on behalf of Mr. Levering's
18    company to purchase that airplane?
19    A. I don't remember specifically, but I would
20    be happy to get it for you.

6    Q. Now, do you know that the Levering Aviation
7    entity is owned by Mr. Levering?
8    A. You know, I probably really don't know for
9    sure, but it's my -- you know, that's what I think.
10    Q. But you have no idea who owns westwind II,
11    LLC?
12    A. No.

Page 63

20    Q. who owns that boat? Do you know?
21    A. CCH Charters.
22    Q. And who is that? Do you know who that is?
23    A. I believe it's ms. Kisla.
24    Q. CCH Charters, is that ms. Kisla?
25    A. Yes. To the best of my knowledge.

1    Q. Okay. So her company owns that boat?
2    A. Yes.
3    Q. Do you know anything about how her company
4    acquired it?
5    A. Yes.
6    Q. And can you tell me that?
7    A. Yes, sir. ms. Kisla purchased the boat and
8    Nitro Gaming, Inc., made a bridge loan to her for -
9    I don't remember the exact number, but I believe it's
10    about $550,000, and she purchased the boat and
11    started a charter company.
12    Q. And when did Nitro Gaming make this loan to
13    her?
14    A. I don't recall specifically, but I would be
15    more than happy to get you the date.
16    Q. Is it before or after you filed bankruptcy?
17    A. I don't know, but my best guess is probably
18    after.
19    Q. Did you make the decision after you filed
20    bankruptcy to cause Nitro Gaming to loan to ms. Kisla
21    $550,000 to help purchase a yacht?

-31-

22    A. No, sir. That decision was made in, gosh,
23    march or April of 2009.
24    Q. But you made the decision to fund the loan
25    after you filed bankruptcy?

1    A. Yes. we had made the commitment to do so
2    and followed through with it.
3    MS. STRANGE: when you say "we made the
4    commitment."
5    A. Excuse me. Nitro Gaming did.

Pages 65-66

2    Q. And where did the money come from? Did
3    Nitro Gaming take it out of its bank account or did
4    it borrow the money?
5    A. I believe Nitro Gaming took it out of its
6    bank account.
7    Q. what's the status of that loan?
8    A. It's my understanding that ms. Kisla is
9    seeking a formal mortgage for the balance on the
10    boat.
11    Q. what was the amount of the purchase price of
12    the boat and what is the amount of the bridge loan?
13    A. The bridge loan I believe is $550,000.
14    Q. what was the purchase price?
15    A. I don't recall specifically.
16    Q. was it more or less than the bridge loan?
17    A. more.
18    Q. DO you know where she got the balance of the
19    money?
20    A. I do not.
21    Q. Did she get it from you or any entity in
22    which you own an interest?
23    A. No.
24    Q. Does Nitro Gaming have a first lien on the
25    boat?

1    A. Yes. That's my understanding.
2    Q. Do you own an interest in CCH?
3    A. I do not.
4    Q. Does anybody other than Ms. Kisla?
5    A. I don't believe so, but I'm not positive
6    about that.
7    Q. who formed CCH for Ms. Kisla? Do you know?

-32-

8       A. I don't recall. She probably did.
9       Q. Did the lawyer that I just asked you about
10      that did the closing, did he represent Nitro Gaming
11      or did he represent Ms. Kisla's company?
12      A. I believe Ms. Kisla's company.
13      Q. who represented Nitro Gaming?
14      A. I think we just took the promissory note
15      from the closing.
16      Q. who verified that you obtained a lien on the
17      boat and it was perfected?
18      A. Closing lawyer.

Pages67-68

**January 22, 2010 Rule 2004 Examination Excerpts**
**Ashley Kisla**

22    Q You  were the buyer of the boat. Tell me where
23    a million-three cash dollars came from to pay
24    for a boat that your company bought. I want
25    to know every source of that million-three.

Pg 60

1    A Well, there would have been all of the money
2    that was owed to me from all of the various
3    companies.
4    Q All right. Well, we've just testified -- you
5    just testified that it all showed up on
6    Nitro's books beforehand.
7    A Right.
8    Q So did Nitro write a check for a
9    million-three?
10    A I don't know jf it was a check, or a wire, or
11    a money order.
12    Q From what account?
13    A I don't -- it would have been -- I would
14    assume, the ZBA account. I don't know.
15    would have to go back and look or have someone
16    pull it for me.
17    Q Well, who gave the instructions to send the
18    wire?
19    A It wasn't me. I don't know.
20    Q Well, it's your boat.
21    A I understand, and I paid for all of it. I was
22    going to be out of town and wasn't going to be
23    able to be there.
24    Q So who else would have had authority in the
25    Rosbottom organization to issue a wire for

Pg 61

1    $1.3 million for an offshore closing when you !
2    weren't there?
4    what it was.
5    Or a check, any payment. I don't care what it
6    is. A payment -- who authorized the payment?

-34-

7      A I don't know. I wasn't there.

8      Q Did you talk to Mr. Rosbottom, that, "Harold,

9      this check has got to be paid. This payment

10     has got to be paid. We've got to buy the

11     boat"?

12     A I was not there. I don't know how the funds

13     were handled. I know what my portion of it

14     was that was contributed. I know that there

15     was a bridge loan for $550,000.

16     Q Where were you?

17     A I had to go to -- I was actually in New

18     Orleans, then Shreveport, and then Coushatta.

19     Q And you never talked to Mr. Rosbottom about

20     how a million-three got down to Florida?

21     A I don't believe so. I trued up --

22     Q And you've never talked to anybody in your

23     organization about how a million-three got to

24     Florida?

25     A I don't believe so.

Pg 62

1      Q Who has authority to issue wires out of the

2      ZBA account?

3      A Harold would have authority. I would have

4      authority.

5      Q For a million-three?

6      A Angie would have authority.

7      Q For a million-three?

8      A Yes, sir, if the money is there. They sweep

9      the account all the time.

10     Q Who else? That's Angie Maher, M-A-H-E-R?

11     A Um-hum. Angela Maher. At that time, Greg

12     Cartalano.

13     Q When did he leave?

14     A July 22nd.

15     Q Who else?

16     A That's probably it.

17     Q Have you ever talked to Angie Maher -- Angela

18     Maher or Greg Cartalano to tell them to send a

19     wire--

20     A No.

21     Q -- for the boat?

22     A No, sir.

23     Q Did you tell Mr. Rosbottom, "Complete this

24    transaction for me"?

25    A I don't know that I said it like that.

Pg 63

1    Q How did you say it?

2    A He knew I was going to be out of town; so he

3    would have handled it for me.

4    Q Well, then you must have had some discussion

5    with him. What discussion did you have?

6    A I don't recall.

Pg 64

8    Q So tell me the financial structure of this

9    transaction; how was Westwind II going to --

10    well, let's go back.

11    The purchase price was roughly a million

12    eighty, right?

13    A Was it a million eight?

14    Q A million eighty.

15    A Oh, I'm sorry.

16    Q About 540,000 for Westwlnd and 540;000 for

17    Levering; is that about right?

18    A Yes, sir.

19    Q Okay. And tell me your understanding of how

20    this was going to be structured.

21    A Nitro paid their portion of it. Levering

22    Aviation, and I'm not sure I understood

23    Levering Aviation at the time, paid their

24    portion, and then, ideally, they were going to

25    turn around and sell it.

Pg 148

1    Q Well, when I say "initiated," Ms. Kisla, I

2    don't mean making the decision. Old you have

3    a discussion with Mr. Rosbottom about the fact

4    that $540,000 needed to go to North Dallas

5    Bank III Trust Company?

6    A I think he sent the wiring instructions, and 1

7    don't remember if they went directly to me or

8    if they went to Greg Cartalano, who would have

9    handled the wire at that point.

10    Q And why would there have been two separate

11     wires?

12     A I don't know.

13     Q Did you have any discussions with

14     Mr. Rosbottom to do it in two separate wires?

15     A No, sir, I don't recall.

16     Q What account did this wire generate from?

17     A It looks like -- I'd have to look at the

18     number, but it looks -- well, it came out of

19     our Chase ZBA, which would have been in the

20     Nitro.

Pg 153

12     Q Let me ask you something: This transaction,

13     you never understood this transaction to be a

14     loan from Nitro Gaming to one of Mr.

15     Levering's companies, did you?

16     A No, sir. Nitro paid their part and whatever

17     entity Craig -- which turned out to be

18     Levering Aviation, paid their part or their

19     half. And that's what it was. I guess it was

20     between Nitro and Levering Aviation.

21     Q Did you consider that Nitro was the beneficial

22     owner, the true owner of Westwind II?

23     A I don't know that I ever thought about it.

24     Q Did you consider that you were the owner?

25     A No.

1     Q All right. So who was the owner, if not you?

2     If you were the member,--

3     A N73Cl.

4     Q Of Westwlnd, II?

5     A Oh, I'm sorry. I was the member, but it was

6     only to sign the paperwork.

7     Q I don't know what that means. Who was the

8     beneficial owner? If there had been a profit

9     on this transaction, who was going to make the

10      prOfit?

11     A Nitro would have made it.

Pg 158-159

9     Q So why did Nitro fund $550,000 towards the CCH

10     boat, and why did it fund $540,000 in the jet

11     transaction? That's 1,090,000, Why did Nitro

12    do that?
13    A Well, I believe the jet transaction that Nitro
14    paid its part was -- it was more of he had
15    made a commitment to Craig levering that he
16    would do this, and I think he was just
17    following through with his word.
18    Q He was -- "He" who? Harold?
19    A Harold Rosbottom.
20    Q Well, he was in bankruptcy.
21    A That's why he didn't loan the money. Nitro
22    did, or Nitro paid. Let me see if we could
23    get rid of the "loan."
24    Q It wasn't a loan, was it?
25    A We've heard "loan." We've heard "advanced."

1    We've heard --
2    Q It was not a loan, was It?
3    A No, sir, it was not a loan for -- Nitro paid.

Pg 175-176